NEWMAN, Circuit Judge,
dissenting.
In prior litigation, the district court held Senju’s patent claims invalid on the ground of obviousness. Before that decision reached finality, Senju requested PTO reexamination, presenting new claims of significantly narrowed scope. The PTO reexamined Senju’s U.S. Patent No. 6,333,045 *1354 (“the '045 patent”), and held the narrowed claims patentable. In this subsequent litigation, the district court gave no deference to the PTO’s review of the restricted claim scope or the unexpected results at that scope, and held the narrowed claims invalid on the same grounds it previously applied to the original claims.[1]
My colleagues on this panel repeat that flawed analysis: they do not consider the scope of the reexamined claims, the unexpected results at that scope, and the teaching-away of the prior art. I respectfully dissent, for these claims have not been shown to be invalid.
Discussion
The Senju inventors discovered that a composition containing the antibiotic gatifloxacin enhances corneal permeability when combined with very low amounts of ethylenediaminetetracetic acid (EDTA) at a specific pH. This is the appellants’ Zymar® product, whose commercial and medicinal success is the impetus for this Hateh-Waxman Act challenge to Senju’s patent.
The prior art is crowded. It contains much data on quinolones, the family of which gatifloxacin is a member. The prior art also shows the use of chelating agents, such as EDTA, as excipients that enhance stability of ophthalmic medications. However, no combination of prior art references shows or suggests the use of very low concentrations of EDTA to enhance the corneal permeability of antibiotic formulations of gatifloxacin, or of any other quinolone.
In this crowded field, the specific combination and concentration here claimed is not shown, and the published scientific data lead away from the claimed subject matter. These inventors discovered that, when using EDTA at a concentration of 0.01 w/v%, the formulation is not only effective as an antibiotic, but, contrary to the prior art, increases the corneal permeability of gatifloxacin.
I focus specifically on reexamined claim 6:
6. A method for raising corneal permeability of an aqueous pharmaceutical Gatifloxacin eye drop solution comprising Gatifloxacin or its salt, having a pH of from above 5 to about 6 containing from about 0.3 to about 0.8 w/v% Gatifloxacin or its salt, which comprises incorporating about 0.01 w/v% disodium edetate into [eye drops containing Gatifloxacin or its salt] said Gatifloxacin eye drop solution.
'045 patent, col. 11. 25-col. 21. 5.
During reexamination, the PTO examiner found that no reference or combination of references teaches or suggests the improved corneal permeability obtained using EDTA at the low concentration of 0.01 w/v%. The prior art experimental data show either no effect at 0.01 w/v% or enhanced permeability at concentrations above 0.01 w/v%.
No reference shows improved corneal permeability at such low concentrations of EDTA; all indications are that the EDTA concentration should be above 0.01 w/v%. The Senju discovery contradicts the observations reported in the prior art. Nonetheless, the panel majority holds that it was obvious that superior results would be obtained by reducing the concentration.

The Grass et al. Scientific Articles

Of primary import to the district court’s opinion are three publications by Dr. *1355 George M. Grass, et al. The panel majority states that these publications render the claimed combination obvious. To the contrary, these publications teach away from the direction taken by the Senju inventors.

Grass et al., Mechanisms of Corneal Drug Penetration I: In Vivo and In Vitro Kinetics, 77 J. Pharm. Sci. 3 (1988) (“Grass 1988-T”):

The panel majority states that the Grass 1988-1 reference shows that the three concentrations of EDTA tested (0.1, 0.05 and 0.01 w/v%) are effective at enhancing corneal permeability. That is incorrect. Grass 1988-1 shows that EDTA at a concentration of 0.01 w/v% produced a zero percent increase in corneal permeability, measured for both methanol and glycerol. Grass 1988-1 also states that the in vitro experiments were performed at exposures (3 hours) significantly longer than most topical applications would provide, yet the reported data are that EDTA at 0.01 w/v% was totally ineffective.
Grass 1988-1 discusses the work of other investigators, and reports no corneal penetration of mannitol using EDTA at concentrations of 0.2 and 5 mM. Grass 1988-1 concludes that corneal permeability increases with increased concentration of EDTA. This leads directly away from any suggestion or expectation of improved permeability of gatifloxacin formulations with concentrations of EDTA as low as 0.01 w/v%.
The appellees concede that Grass 1988-1 shows no statistically significant increase in corneal permeability at the low concentration of 0.01 w/v%: “the data did not reach statistical significance.” Appellee Br. at 13. Yet, the panel majority affirms the district court’s unsupported finding that the “prior art suggests the use of concentrations as low as 0.01 w/v% EDTA would be effective to increase corneal permeability.” Dist. Ct. Op. at *11. This finding is contrary to the record. The most that Grass 1988-1 can be deemed to “suggest” is that the EDTA concentration should be higher than 0.01 w/v%.
The two other cited Grass publications reinforce the “teaching away” of the prior art:

Grass et al., Effects of Calcium Chelating Agents on Corneal Permeability, 26 Investigative Ophthalmology & Visual Sci. 110 (1985) (“Grass 1985”):

Grass 1985 describes the effects of the chelating agents EDTA and Cromolyn on corneal permeability of glycerol and progesterone in rabbit eyes. Grass 1985 reports that EDTA at concentrations of 0.5 w/v% increased glycerol concentration in the aqueous humour, and concludes that the addition of chelators at high concentrations or by frequent application may increase the permeability of the corneal epithelium. This reference shows enhanced effects at higher concentrations, not the low concentration in claim 6.

Grass et al., Mechanisms of Corneal Drug Penetration II: Ultrastructural Analysis of Potential Pathways for Drug Movement, 77 J. Pharm. Sci. 15 (1988) (“Grass 1988-11”):

Grass 1988-11 describes electron microscope studies of rabbit eyes exposed to EDTA and glycerol, specifically analyzing corneal epithelial cell junctions after treatment with EDTA and glycerol. Grass 1988-11 reports that the effects of EDTA depend on concentration and exposure time, and that at concentrations of 0.01 w/v% EDTA, the epithelial tissue showed no visible expansion of the intercellular spaces, which is described as correlating with corneal permeability. The authors interpret these results as showing that “in vitro concentrations of EDTA above 0.01% caused increased permeability of the cornea to glycerol.” Grass 1988-11 at 22.
*1356 Collectively, the Grass references show or suggest that EDTA must be used at concentrations higher than 0.01 w/v% to effectively increase corneal permeability.

Opthalmic Drug Delivery Systems, (Ashim K. Mitra ed., Marcell Dekker, Inc., 1993) (“Mitra”):

The Mitra book summarizes the research and knowledge in this field, and states that experiments using low concentrations of EDTA were “devoid of any effects (62), suggesting a concentration dependence.” Mitra at 188. Mitra states that EDTA-drug combinations “deserve investigation,” but that “[i]t seems likely that the high concentration of divalent cations in the tear film would prevent EDTA from enhancing permeability.” Id. Mitra adds that while improving drug transport across the cornea found some success, “it is in the modification of the drug that has generated greater interest.” Id.
The panel majority rejects the argument that Mitra teaches away from Senju’s discovery, stating that Mitra does not “provide any indication that lower EDTA concentrations would not also work.” Maj. Op. at 1350. That is not the law of “teaching away.” A reference need not foresee a later-discovered invention and warn against it, to teach away from the discovery. Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1343 (Fed.Cir.2011).
A reference teaches away when it leads to a path divergent from that taken by the patentee. Pozen, Inc. v. Par Pharm., Inc., 696 F.3d 1151, 1165 (Fed.Cir.2012). Mitra explicitly sets forth two separate paths for investigation — high concentrations of EDTA and drug modification — both of which diverge from the path in claim 6. The entire body of prior art leads in the direction opposite to reducing the EDTA concentration, for the body of prior art points toward higher, not lower, concentrations of EDTA to enhance corneal permeability.

Other References

Three other references relied on by the district court (U.S. Patent Nos. 4,551,456; 4,780,465; and 4,980,470) make no mention of improving corneal permeability. Those references describe gatifloxacin as an antibiotic and EDTA as a traditional excipient, i.e., as an inactive drug ingredient; they contain no teaching or suggestion related to corneal permeability.

The Legal Conclusion of Obviousness

Obviousness is a matter of foresight, not hindsight. A determination of obviousness requires some reason or suggestion, in the prior art or in common sense, that the claimed subject matter is likely to be effective for its intended purpose. KSR Int’l Corp. v. Teleflex Inc., 550 U.S. 398, 420-22, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). Here, the prior art taught away from the claimed combination when it indicated that higher concentrations of EDTA are needed to enhance corneal permeability.
The panel majority relies on the unsupported opinion of Lupin’s expert witness, and gives that unsupported opinion greater weight than the experimental data. Such reliance is discredited. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (“Proposed testimony must be supported by appropriate validation — i.e., ‘good grounds,’ based on what is known. In short, the requirement that an expert’s testimony pertain to ‘scientific knowledge’ establishes a standard of evidentiary reliability.”).
Contrary to the theory of Lupin’s expert, the extensive Grass data show no statistically significant enhancement of corneal permeability in the experiments using EDTA at low concentrations, or for other chelating agents at low concentra *1357 tions. The prior art did not test the specific combination of gatifloxacin and 0.01 w/v% of EDTA and did not discover the subject matter that is here claimed.
Notwithstanding the published contrary-data, the panel majority calls upon judicial hindsight and finds that persons skilled in the field of the invention would have recognized that 0.01 w/v% EDTA would increase corneal permeability of gatifloxacin formulations. However, the scientists conducting the Grass studies interpreted their data to “suggest that under conditions of sufficient calcium chelation, either by high enough concentrations of one or more chelators or frequent application at short intervals, preservatives may indeed enter anterior segment tissue.” Gras 1988-1 at 11. Grass suggested “high enough concentrations,” not very low concentrations.
The published contemporaneous statements of scientists interpreting their experiments warrant more weight than unsupported opinions appearing for the first time in litigation. Grass did not test the composition here patented, and reported to be a product now of medical choice.
Senju’s pre-litigation experiments further support the conclusion that one skilled in the art would not have expected to enhance corneal permeability using the method of claim 6. The district court acknowledged that the claimed levels of EDTA were shown in Senju’s experiments to produce a significant increase in the concentration of gatifloxacin in the aqueous humour. Nevertheless, the court faulted Senju’s expert because he did not use statistical analysis to show that the effects were unexpected. Statistical analysis can indeed be helpful at times, but the perspective of those skilled in the art cannot be ignored. With the exception of Lupin’s expert witnesses, those skilled in the art interpreted Senju’s experiments as demonstrating unexpected results.
Conclusion
The scientific references, the experimental record, and the commercial success all support the conclusion that the subject matter of claim 6 would not have been obvious to a person of ordinary skill at the time of the invention. The PTO on reexamination correctly applied the law of obviousness. Invalidity of reexamined claim 6 was not proved by clear and convincing evidence. From my colleagues’ contrary ruling, I respectfully dissent.

. Senju Pharm. Co., Ltd. v. Lupin Ltd., Civ. No. 11-271-SLR, 2013 WL 4101820 (D.Del. Aug. 9, 2013) ("Dist.Ct.Op.").